# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | Case No. 1:13CR00017 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **ALEN JOHANNES SALERIAN,** | ) | By: James P. Jones |
| | ) | United States District Judge |
| Defendant. | ) | |

*Jennifer R. Bockhorst, Assistant United States Attorney, Abingdon, Virginia, for United States of America; Glen Donath and Matthew R. Palmer-Ball, Katten Muchin Rosenman LLP, Washington, D.C., for Defendant.*

In this criminal case, the defendant has filed a Motion to Dismiss and to Disqualify Government Counsel, alleging that the government knowingly received and reviewed privileged attorney-client communications in violation of the Sixth Amendment. Having referred this matter to the magistrate judge, and having conducted a de novo review, I adopt the magistrate judge's Report and Recommendation and deny the defendant's motions.

I

The magistrate judge summarized the facts as follows:

By Superseding Indictment issued by a grand jury sitting in this district on June 25, 2013, Salerian is charged with one count of conspiracy to unlawfully distribute and 143 counts of distributing Schedule II controlled substances without a legitimate medical purpose and beyond the bounds of medical practice in violation of 21 U.S.C. §§ 846, 841 and 841(b)(1)(C). Salerian is a medical doctor with a specialty in psychiatry who previously operated the Washington, D.C., based Washington Center for Psychiatry, which was renamed as the Salerian Center for Neuroscience and Pain in 2010.

Salerian originally was charged in this district by indictment issued on April 16, 2013. This court's involvement with the investigation of Salerian dates back to at least September 2011 when the [magistrate judge], in a sealed Memorandum Opinion, resolved a privilege issue with regard to Government subpoenas issued to Salerian and his practice's records custodian to appear before the grand jury in this district and produce certain records of his practice. The Government's investigation of Salerian, however, began some time before March 3, 2011, when search warrants were executed on his Maryland residence and his D.C. office. The charges against Salerian are scheduled for trial beginning February 10, 2014.

This matter is currently before the court on Salerian's Motion seeking the dismissal of the Superseding Indictment and disqualification of the Government's current trial attorneys from any further participation in an investigation of Salerian's conduct as alleged in the Superseding Indictment. Salerian's counsel argue that the charges against him should be dismissed because the Government's counsel, in the course of their investigation, received at least 11 separate privileged communications between Salerian and his counsel.

At the October 29 hearing, counsel for the Government, Assistant United States Attorney Jennifer Bockhorst, testified that the Government received these communications between Salerian and his counsel from grand jury witness Lynette Rash, ("L. Rash"). Bockhorst stated that, some time prior to May 15, 2012, L. Rash approached the U.S. Attorney's Office stating that she had information that she wished to share regarding Salerian. Bockhorst

stated that the first time she saw the notebook containing the communications between Salerian and his counsel, ("Notebook"), was on May 15, 2012, when she met with L. Rash for a proffer session. L. Rash brought the Notebook to the meeting with Bockhorst and offered it to her. Bockhorst testified that she opened the Notebook in order to peruse the contents. Bockhorst stated that the first document she saw was some nondescript correspondence. The next document she saw, however, was on the letterhead of Salerian's counsel, Glen Donath, and contained a heading stating "Privileged Communication." Bockhorst stated that she immediately closed the Notebook and did not read the contents of this letter or any other document contained in the Notebook. Bockhorst testified that L. Rash told her that she had been given the Notebook by Salerian. Bockhorst stated that neither she, nor the case agent present at this meeting, Nick Worsham, took custody of the Notebook that day. A subpoena was obtained for L. Rash to appear before the grand jury on the next day and to produce all records regarding Salerian in her possession.

Bockhorst testified that L. Rash appeared and testified before the grand jury on May 16, 2012. During L. Rash's testimony, Bockhorst questioned her about how she had obtained the Notebook. Based on L. Rash's testimony, Bockhorst stated that she had concluded that any privilege that may have applied to the contents of the Notebook had been waived by Salerian when he gave the Notebook to L. Rash. Bockhorst stated that, after L. Rash's grand jury testimony, she instructed Worsham to take custody of the Notebook, to place it in a sealed folder and mark that it potentially contained privileged material and place it, along with the other evidence provided by L. Rash, in the grand jury evidence room at the Abingdon U.S. Attorney's Office. Bockhorst stated that the only persons who had access to this grand jury evidence room were employee[s] of the U.S. Attorney's Office and, on occasion, various federal agents who placed evidence in the room.

Bockhorst testified that L. Rash actually went on to serve in the investigation of Salerian in an undercover informant capacity. Eventually, however, the Government decided to discontinue using L. Rash in this capacity.

Bockhorst testified that she has not reviewed the contents of the Notebook and, in fact, she had forgotten about the Notebook and its contents until earlier this year. Bockhorst could offer no explanation for why she had forgotten about the Notebook except to say that, at some point in the investigation, the Government had decided not to use any evidence provided by L. Rash. Bockhorst stated that earlier this year, the Government's trial team had decided to disclose all of the evidence in its possession to Salerian's defense counsel. Bockhorst said that in June she assigned a staff member in the U.S. Attorney's Office, Lori Sykes, to scan the remaining documents into electronic format, save them to the Salerian discovery folder on the [shared] T drive of the office computer system and place them on a computer disc that would be given to defense counsel. Bockhorst stated that when, on July 18, 2013, she reviewed a list of the documents Sykes had scanned into electronic form and saved in the discovery folder on the T drive, she realized that it contained information that might be protected under the attorney-client privilege. Bockhorst testified that she immediately stopped reviewing the material contained in the discovery folder, and she instructed Dennis Lee, Special Assistant United States Attorney, ("SAUSA"), assisting in the prosecution of Salerian, not to access the folder until such time as all potentially privileged information was removed.

Bockhorst testified that, despite these events, she still did not remember that the Government had taken custody of the Notebook from L. Rash containing potentially privileged information. Bockhorst testified that she immediately notified defense counsel that she had discovered 14 potentially privileged documents within the documents the Government was preparing to produce to defense counsel. Bockhorst stated that she then called in a previously designated "taint" team, including Special Assistant United States Attorney Janine Myatt and her legal assistant, Mary Blackburn, who reviewed the contents of the discovery folder on the T drive and removed any potentially privileged information.[1] Bockhorst stated

---

[1] At the recent hearing relating to the defendant's objection to the magistrate judge's report, Bockhorst indicated that her testimony confirming that the T drive was cleared of all of the documents in question was based upon the representations of Myatt and Blackburn. Since that time, the government's "taint team" has located a single

that she had been informed by Myatt that the entire contents of the Notebook received from L. Rash had been scanned and placed in the Government's discovery folder.

Bockhorst testified that, to date, she has not reviewed any of the contents of the Notebook. She also stated that she was not aware of anyone else on the Government's trial team reviewing the contents of the Notebook. She stated that only employees of the U.S. Attorney's Office had access to the shared T drive on the office computer system. Bockhorst stated that she knew that she had not reviewed any of the correspondence contained in the Notebook because she had not reviewed any correspondence between Salerian and his counsel at any time during the investigation.

Special Agent Nick Worsham testified that he was present when L. Rash was interviewed by Bockhorst on May 15, 2012. He stated that L. Rash arrived with several notebooks in her possession containing material that she claimed was relevant to the Government's investigation of Salerian. Worsham testified that Bockhorst opened one of these notebooks and saw that it contained letterhead from Salerian's counsel, and she closed the Notebook and did not examine its contents any further. Worsham stated that he took possession of this and the other notebooks from L. Rash on May 16, 2012, pursuant to a grand jury subpoena after L. Rash had finished testifying. Worsham testified that he placed the Notebook inside of a folder and taped [it] shut. He stated that he marked the folder as containing potentially privileged information. Worsham stated that he placed the folder in a box with the other evidence and gave the box to the staff at the U.S. Attorney's Office to be placed in the grand jury evidence room that same day. Worsham said he never saw the box or the Notebook again after that date and that he was reassigned out of the Western District of Virginia in July of 2012. Worsham testified that he never reviewed the contents of the Notebook and that he did not have access to the U.S. Attorney's Office computer system's shared T drive.

---

additional — but accessible — document retained on the T drive, and it has been removed.

Lori Sykes also appeared and testified. Sykes testified that she worked at the U.S. Attorney's Office from June 1, 2012, to July 24, 2013. Sykes stated that she began scanning evidence in the Salerian case when she first started work at the U.S. Attorney's Office and that she continued until her last day working at the office. Sykes stated that she did not specifically remember opening any sealed folder marked that it contained potentially privileged material and did not remember scanning the contents of the Notebook.

Attorney Ann Margaret Brammer from Tazewell, Virginia, also testified. Brammer stated that she previously had represented Rob Rash, ("R. Rash"), L. Rash's son, on state drug charges brought by Lee in his role as Tazewell County Commonwealth's Attorney. Brammer testified that, through her representation of R. Rash, she developed a close relationship with L. Rash. Brammer stated that she met Salerian at L. Rash's home in Abingdon on one occasion when she traveled there to consult with her client. On this occasion, Brammer stated, she asked Salerian to provide certain of R. Rash's records to her. Sometime later, Brammer said, L. Rash delivered some notes from Salerian to her.

Brammer testified that she spoke to Salerian on one occasion on the telephone regarding his treatment of her client. On this occasion, Brammer said, Salerian told her that he may want to retain her to represent him on some civil charges, but he never told her the subject matter of the representation. Brammer stated that she never spoke any further with Salerian of representing him because she had no intention of taking him as a client. Brammer specifically testified that she never told Salerian she would represent him.

Brammer stated that several weeks, or possibly months, after her telephone conversation with Salerian, L. Rash brought the Notebook from Salerian to her for her review. Brammer said that L. Rash told her that she thought the contents of the Notebook would help her son's case.[2] Brammer stated that she never took the Notebook from L. Rash. Brammer said that L. Rash felt like she and

_____

[2] The defendant disputes the contention that L. Rash reviewed the contents of the notebook and rejects the magistrate judge's reliance on this testimony to draw that conclusion.

her son were being persecuted by Lee. L. Rash's son, Brammer said, faced a substantial sentence if convicted of the charges he faced. Brammer stated that, according to L. Rash, L. Rash wanted to show her the Notebook because L. Rash thought its contents showed that Salerian was being persecuted like she believed her son was being persecuted.

Brammer testified that L. Rash did not tell her that she was acting on behalf of Salerian when L. Rash offered the Notebook to her. Brammer testified that L. Rash did not say that she was instructed by Salerian to give Brammer the Notebook with regard to her potential representation of Salerian. She also testified that L. Rash did not act as her agent in bringing the Notebook to her.

Brammer stated that she was present with L. Rash at the proffer session at the U.S. Attorney's Office on May 15, 2012. Brammer stated that she had told L. Rash to bring with her any documents that she possessed which she thought would help. Brammer stated that L. Rash was not under any type of subpoena to appear and produce evidence to the Government at this time. Instead, she stated that the meeting had been arranged because L. Rash believed it would help her son in his state court prosecution. Brammer stated that, at this meeting, Bockhorst opened one of the notebooks brought by L. Rash and then quickly closed it back after seeing that it contained correspondence from Salerian's counsel.

Brammer stated that, at L. Rash's request, she accompanied L. Rash on a trip to Houston, Texas, to meet with Salerian and Ron Paul. Brammer stated that she understood the purpose of the trip to be for her to represent R. Rash's legal problems to Ron Paul during a meeting Salerian had arranged with Paul to present him with a $50,000 donation to Paul's presidential campaign. Brammer stated that she, L. Rash and Salerian never met with Paul on this trip.

Brammer stated that her client and L. Rash cooperated in the federal investigation of Salerian. She said that the state court judge who sentenced R. Rash was made aware of this cooperation. She said that R. Rash received a total four-year sentence on the charges he faced.

According to the grand jury testimony of L. Rash, she obtained the Notebook from Salerian.  L. Rash testified that Salerian gave her stacks of papers on more than one occasion, including many of her son's records. (Government's Exhibit No. 1, (Docket Item No. 61), Transcript of the May 16, 2012, grand jury testimony of Lynette Rash, ("Rash Transcript"), at 70-72.) Concerning her possession of the Notebook, L. Rash testified:

A      …And he wanted me to take [the Notebook], he actually offered me two, one for myself and one for [Ann Brammer], to take for her to review the documents…. [H]e just told me, he said "Here, take this, Lynn."

Q      And what did you say in response?

A      I told him, you know, I just needed one and –

Q      Okay. I mean well, did you tell him you would take it to the, to the attorney?

A      Oh, yes. I, I told him that I would take it.

Q      To, to your attorney?

A      Yes.

Q      You didn't say something about you not being an agent of the attorney?

A      Oh, oh, I –

Q      That you wouldn't deliver it?

A      No. He asked me if I could assure, you know, he wanted Ann to, to be his attorney.

Q      All right.

A      And I told him that I was not an agent of Ann's; I couldn't tell him if Ann would be his attorney or not.

Q  Okay.

A  And that's when he wanted me to take that. Yes, I did say that.

Q  All right. And was that notebook for Ann or was that notebook for you, the one that you took?

A  He, he actually wanted us to – I – me to take two, you know, one for myself, one for her, and I said, "I only need one," so I took it and I told him that I would share it.

Q  Okay. Okay.

A  And, of course, Ann said she didn't want to be his attorney, so I still have it.

Q  All right. And did you, and did you relay that back to Dr. Salerian, that Ann did not want to be his attorney?

A  Yes.

Q  Did he ask you for that notebook back?

A  No.

Q  Okay.

A  No, he hasn't asked me for anything back.

*United States v. Salerian*, No. 1:13cr00017, 2013 WL 5964358, at *1-5 (W.D. Va. Nov. 8, 2013) (footnote and citation to record omitted).

The magistrate judge concluded that Dr. Salerian had failed to prove that he had not waived his attorney-client privilege in providing the documents to L. Rash. The magistrate judge found that L. Rash's testimony established that Dr. Salerian

provided the notebook not only for transmittal to Brammer but also for her own review. The magistrate judge further found that the government's trial team did not review the contents of the notebook, and as such, there could be no violation of the Sixth Amendment.

Dr. Salerian timely filed objections to the magistrate judge's Report and Recommendation. The defendant contends that Judge Sargent erred in her conclusions with respect to waiver of the privilege and the government's review of the notebook. I must review the aspects of the report to which Salerian objects de novo, and either "accept, reject, or modify, in whole or in part, the findings or recommendations" made by the magistrate judge. 28 U.S.C.A. § 636(b)(1) (West Supp. 2013); *see* Fed. R. Crim. P. 59(b)(3). Although a district judge may give a magistrate judge's proposed findings and recommendations "such weight as [their] merit commands and the sound discretion of the judge warrants," the authority and the responsibility to make an informed final determination remains with the district judge. *United States v. Raddatz,* 447 U.S. 667, 682–83 (1980) (internal quotation marks and citation omitted). Therefore, in performing a de novo review, I must exercise my "non-delegable authority by considering the actual testimony, and not merely by reviewing the magistrate's report and recommendations." *Wimmer v. Cook,* 774 F.2d 68, 76 (4th Cir.1985).

I have carefully reviewed the record, including the transcript of the evidentiary hearing before the magistrate judge, and I find that the objection must be denied. I accept the magistrate judge's credibility determinations and find that under the applicable legal principles the defendant's motion should be denied.

## II

Concerning the attorney-client privilege, the disputed issue is not whether the particular documents fall within the scope of the privilege but whether Dr. Salerian waived this privilege in giving the notebook to L. Rash. "'It is of the essence of the privilege that it is limited to those communications which the client either expressly made confidential or which he could reasonably assume under the circumstances would be understood by the attorney as so intended.'" *Sheet Metal Workers Int'l Ass'n v. Sweeney*, 29 F.3d 120, 125 (4th Cir. 1994) (quoting McCormick on Evidence § 91 (Cleary ed. 1972)). Relevant here, the privilege is implicitly waived "when the party claiming the privilege has made any disclosure of a confidential communication to any individual who is not embraced by the privilege." *Hawkins v. Stables*, 148 F.3d 379, 384 n.4 (4th Cir. 1998). Furthermore, "it is the defendant's conduct that is examined to determine if it waived the privilege . . . and not its assertions concerning intent." *F.C. Cycles Int'l, Inc. v. Fila Sport, S.p.A.*, 184 F.R.D. 64, 73 (D. Md. 1998).

Dr. Salerian's conduct does not evince an intent to maintain the confidential nature of the notebook. While he contacted Brammer on a single occasion and indicated that he may want to retain her for representation in a matter unrelated to this criminal case, no such representation was ever undertaken. After several weeks or possibly months, Dr. Salerian disclosed the notebook to L. Rash, who in turn delivered the notebook to Brammer. However, according to Brammer, Rash never suggested that she was delivering it for the purposes of securing representation for Dr. Salerian. In fact, at the request of Brammer, Dr. Salerian had previously turned over other documents — including records of her son's medical treatment — in order to aid in Brammer's representation of R. Rash. In this context, there is nothing to suggest that Dr. Salerian intended this notebook to be treated differently than the previously provided materials that had been transmitted to Brammer via L. Rash. At most, Salerian's conduct shows the intent to continue aiding L. Rash in her son's criminal prosecution, with the attendant hope that Brammer may represent him in unrelated proceedings.

Furthermore, the defendant's asserted standard for confidential agency does not negate Dr. Salerian's conduct supporting waiver. Under the Restatement standard espoused by the defendant,

> [a] person is a confidential agent for communication if the person's participation is reasonably necessary to facilitate the client's communication with a lawyer or another privileged person and if the client reasonably believes that the person will hold the communication

in confidence. Factors that may be relevant in determining whether a third person is an agent for communication include the customary relationship between the client and the asserted agent, the nature of the communication, and the client's need for the third person's presence to communicate effectively with the lawyer or to understand and act upon the lawyer's advice.

Restatement (Third) of the Law Governing Lawyers § 70(f) (2000). Assuming it would be reasonable for the defendant to believe L. Rash would hold the notebook in confidence, L. Rash's participation was not reasonably necessary to facilitate Dr. Salerian's communication with the lawyer. The illustrations of reasonable necessity in the Restatement include scenarios where the police refuse a client access to regular counsel or where the client and attorney do not speak a common language. L. Rash was not reasonably necessary in this sense or any conceivable sense, for that matter. Dr. Salerian could have as easily transmitted the notebook directly to Brammer as to L. Rash. In fact, he had spoken directly with her about representation some time before. Moreover, in consideration of the factors listed in the Restatement, it was not customary for L. Rash to assure the confidentiality of Dr. Salerian's materials, and indeed, the materials that he had previously divulged to aid in the defense of L. Rash's son. Other than Dr. Salerian's indicated interest in helping her son (a former patient) and the similar charges that he faced, there was no link between L. Rash and Dr. Salerian. For these reasons, I find that Dr. Salerian waived the attorney-client privilege as to the communications contained in the notebook.

However, even if there was no waiver, I find the government's receipt of these materials was not a violation of the Sixth Amendment right to effective assistance of counsel. It is true that "the essence of the Sixth Amendment right to effective assistance of counsel is, indeed, privacy of communication with counsel." *United States v. Brugman*, 655 F.2d 540, 546 (4th Cir. 1981). However, in *Weatherford v. Bursey*, 429 U.S. 545 (1977), the Court held that a government informant's presence during attorney-client conversations did not violate the defendant's Sixth Amendment right to effective assistance of counsel because there was "no tainted evidence in this case, no communication of defense strategy to the prosecution, and no purposeful intrusion" into the attorney-client privilege. *Id*. at 558. The Court later found that, "absent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the [Sixth Amendment] violation may have been deliberate." *United States v. Morrison*, 449 U.S. 361, 365 (1981).

Bockhorst affirmed, upon first seeing defense counsel's letterhead, she immediately closed the notebook, and it was sequestered, albeit clumsily, from the trial team. As such, there is no evidence of a purposeful intrusion into attorney-client communications. Furthermore, the communications were sequestered from the trial team to avoid any resulting prejudice, and Bockhorst has assured the court that she has not reviewed the documents at any time during the pendency of this

case. The government further represents that all communications contained in the notebook have been expunged from its records. Under these circumstances, the extraordinary remedy of dismissing the indictment or disqualifying government counsel is inappropriate.

III

For the foregoing reasons, it is **ORDERED** as follows:

1.    Defendant's Objections to the Report and Recommendation (ECF No. 68) are DENIED;

2.    The Report and Recommendation of the magistrate judge (ECF No. 66) is ACCEPTED; and

3.    Defendant's Motion to Dismiss and to Disqualify Government Counsel (ECF No. 34) is DENIED.

ENTER:   January 28, 2014

/s/  James P. Jones
United States District Judge